Ms. Benson you may proceed. May it please the court Elizabeth Benson on behalf of petitioners and I'd like to reserve five minutes for rebuttal. As this court as this court is aware Mountain Valley Pipeline is a 304 mile pipeline that cuts across steep mountains and deep valleys in West Virginia and Virginia. The biological opinion at issue here estimates that sediment from this one project will impact over a thousand miles of streams. Some of those streams are home to critically important populations of the two endangered fish at issue in this case the Roanoke log perch and the candy darter. The Fish and Wildlife Service anticipates that the darter will be functionally extinct within 25 years and a leading Roanoke log perch scientists inform the agency that any additional sediment loading is inherently problematic for persistence of log perch populations. Let me make sure I understand what you said you said be functionally extinct even without the pipeline in 25 years? Yeah the Fish and Wildlife Service in their 2018 species status assessment runs various like future scenarios and the three that it considers most likely all end with the species being functionally extinct within 25 years and that's primarily due to hybridization with another species. So even without the pipeline just so I'm make sure I understand you. Yes under all three likely scenarios it will be functionally extinct although the you know the candy darter recovery outline has many goals to try to prevent that from happening. Ms. Benson that begs the question how if at all this project accelerates or has a substantial impact on what you've told us as a more bond future for this species? Yes your honor well we're baseline conditions already jeopardize a species an agency can't take action that deepens that jeopardy by causing additional harm which is what this this pipeline would do. So in the limited time we have today I'd like to focus on the service's failure to analyze past present and future stressors impacting the action area, its arbitrary analysis of recovery impacts and its weakening of previously established take thresholds without a reason basis. So Kevin this argument in a way that kind of breaks it down for us this is something you guys do every day and you use these acronyms as though the guy walking up the street uses them but we don't. So every time we do these cases even though this panel probably we've done more these cases that many people it's still something difficult to wade through. So you got two sections here section 7 section 9 as I understand that's really where you're going with in terms of your complaint here on each one. So approach it from that angle at least in terms of the law and how it's not being followed in this instance. Sure so the law requires that the service establish an environmental baseline to which the project's impacts will be added and it also has to consider non-federal future impacts in the cumulative impacts section. The jeopardy analysis has to take that environmental baseline and those cumulative effects into account along with the status of the species when it makes its jeopardy determination. So it's supposed to analyze the past present and future impacts environmental baseline and cumulative effects sections or analyses and then those have to be considered when it makes its jeopardy analysis. So basically the service can't look at a project's impacts in a vacuum because then any single project is unlikely to make to jeopardize the species. So turning first to the baseline which is the effects of past and ongoing human and natural factors in the action area. Here the record shows that factors already degrading the streams at issue are numerous agriculture, logging, urbanization, mining, chemical spills and so on. The biop provides no analysis of how these stressors are impacting species in the action area which is what is required and doesn't consider those impacts in conjunction with the project effects because it hasn't analyzed them so it can't. For log perch the service has advanced an argument in its briefs that a population viability analysis from 2016 somehow makes up for the biop deficiencies. But population modeling doesn't mean the agency can opt out of this requirement to analyze the baseline and add the project's impacts to that baseline. Why is that? I mean why is the modeling not it doesn't that consider much of what you what you say is necessary the the cumulative effects and and the baseline and at least a population of what is what why is that not sufficient? Well there are several reasons. First of all it doesn't capture the baseline in 2020 because it's from 2016 and the regulations plainly require evaluation of contemporaneous actions which we know are happening here and adding more sediment to log perch habitat. But by the service's logic they don't need to analyze these impacts in the baseline they can just continuously point to 2016 modeling and say that any given project won't make the population go extinct. Which also conflates extinction with jeopardy. So for example in Oceana v. Pritzker which MVP cites the age the agency used the population viability analysis to inform its analysis but it didn't use it to replace the baseline analysis. It had separately analyzed both the baseline and cumulative effects and then considered them in its jeopardy analysis. Well address the service the service service says that log perch and the candy dollar looks like a candy I guess that's why they named it. Population models account for everything that's led to that current status and all potential stresses impacting the dollar. So what's wrong with that? Well for one the viability analysis assumes constant environmental conditions over the next hundred years. So it can't possibly account for increasing threats like climate change. So the services claims there totally fail as do its claims regarding contemporaneous actions somehow being subsumed within this population viability analysis. It's also worth mentioning that Roberts the author of this study according to the biop has said that log perch densities routinely fluctuate by more than 25% per year and sometimes as much as 75% that's a joint appendix 103. So depending on this estimate from 2016 which the viability analysis acknowledges has a lot of uncertainty in it and really isn't meant to be used for this purpose. And a good and also another case that used a population viability analysis turtle restoration I'll turtle island restoration network they both ran the model both with first of all they didn't entirely depend on the model and they both ran the model as kind of the baseline with no change and then with the projects impacts. So here if you look at the jeopardy analysis in the biop or the service analyzes the projects impacts in isolation just exactly what it's not supposed to do analyzes them in a vacuum and then basically says but this project isn't as bad as a catastrophe therefore it's not going to make the population go extinct. That's not the purpose of a baseline analysis it's an action area specific inquiry into the effects and part of the reason for that is that understanding the baseline conditions in the action area is critical to understanding the impact that the project's additional sediment will cause. So if these species. It seemed to me as though you were really saying that the service is only relying only on this model for this baseline and cumulative effects is that that's your contention? There's nothing else in the model? For the baseline they have a single sentence addressing that impacts in the action area include things like siltation and chemical spills and non-point runoff that's a joint appendix 72 to 73. The environmental baseline section is analysis is supposed to be analyzing those impacts they don't say in the action area how those impacts okay siltation for example we don't know how how those impacts are affecting the log perch or its habitat in the action area for this project which is what its issue in the baseline analysis because they just list the impacts and don't discuss their act they list the causes but don't list the actual impact and therefore they can't consider them in conjunction with the projects impacts and indeed they don't. So that's the continual problem we have as I said in dealing with these cases and I wonder you know what is it that really you're seeking if they say the magic words we've done these things and we even if it's in a conclusive way I mean this is the service is saying it is it your contention you can say it but if the analysis and the data is not reflected and what you're saying it doesn't match up or how how do you how are you approaching that? So what the regulations and the case law and the services consultation handbook require is an analysis of the impacts so yes we're saying there's not magic words but you can't just say oh there's some siltation and chemical spills in this area but not have any sort of qualitative analysis of how that is going to be added how the impacts are going to be reflected or any sort of increase in threat like climate change either. The buy-up admits the log perch is impacted by climate change including increased turbidity which this project will contribute to but that's totally ignored in the jeopardy analysis with no explanation of why. So I'll move on to cumulative effects. It was arbitrary for the service to rely solely on MVP's list of narrow narrow list of projects requiring a state construction stormwater permit. The consultation handbook notes that the service can get information on non-federal future actions which is what cumulative effects analysis requires from a variety of sources including inquiries during field reconnaissance in the action area and discussions with other agencies. So can the service rely upon Mountain Valley pipeline for data? I think it could have relied on Mountain Valley pipeline if there had been a complete analysis but this is just what Mountain Valley pipeline provided was a tiny subset of projects and the idea of the cumulative effects analysis is to understand the future context how this species is going to find itself in the future what's going to impact it. So MVP has acknowledged that there are other impacts for example in the Upper Gauley River Basin where the candy darter will be impacted Mountain Valley said there were foreseeable trends demonstrating increases in agricultural activities urban development and road projects. That's the type of future activity that should be considered because it's part of the future context and the consultations handbook provides an example that I think is highly relevant to our inquiry which is that if if there's a highway being built in a county that has a lot of natural gas development future natural gas development is a reasonably foreseeable it's reasonably certain to occur in the future so that should be considered and in the past the service has considered all sorts of activities like agriculture, logging, gas production, water withdrawals, urbanization, chemical spills to establish what these future effects might be and here it just relied on this one narrow list of projects requiring a state construction stormwater permit and it didn't even include all the projects that are would impact the action area because it only looked at projects that are within two miles of the pipeline whereas the there could be a proposal for something right on the banks of the North Fork Roanoke River but four miles down from the pipeline where it's still being impacted by sediment from this pipeline and that wasn't even taken into account even in MVP's extremely limited list. Don't the models actually consider the cumulative effects or do they? No the models have inputs where they have input about demography and life history environmental variability but as I mentioned earlier they assume that it's constant so they again like the environmental baseline they can't substitute for this action area specific inquiry that the agency has to consider when it considers how this project will jeopardize the species and since I'm low on time I'm going to turn quickly to the incidental take statement. To measure take the service said it was adopting harm thresholds that it's Washington field office developed for bull trout consultations and over the past decade the service and the National Marine Fishery Service have applied these thresholds in numerous biops and here the service determined they were the best available methodology to assess impacts but then it abruptly weakened at these previously adopted thresholds making it less likely that the take limit will be triggered during a sedimentation event like a storm which generally causes fluctuating sediment concentrations and it did so relying only on a lay definition of part of a scientific term and without any scientific analysis of why these imperiled species that are extremely sensitive sediment can withstand a weakened standard. With that I see I'm out of town. Thank you Ms. Benson. Mr. McConnell. Good morning and may it please the court Kevin McArdle on behalf of the I'd like to address each of those technical issues and try to help the court reach resolution on the baseline climate change cumulative effects and the ITS but first if I may I'd just like to say a few words on behalf of the career biologists at the service who spent the last year working tirelessly on this new biological opinion. They read the court's prior opinions in the Atlantic Coast pipeline cases. They read them. Do those models do they really consider the cumulative effects? Here's what the model is doing why they're so valuable and why actually they contain probably the best baseline information you'll ever see. They first the whole point of these two studies Roberts for the log perch and the species status assessment for the candy daughter was to present an assessment of the present and future condition of the very populations that occur in the action area that accounts for all ongoing stressors so that land management agencies management agencies like the service can identify the specific populations of concern and come up with management strategies to address those concerns. So the let's take the the Roberts study for the log perch. What does that tell us? Why is it so valuable? Why does it present superior baseline information? Here's why. It tells us three three critical things. It gives us a population estimate that's current about the two specific populations that occur in the action area and are affected by the project. Then it calculates a minimum viability threshold which is the point at which a species has a 95% chance of remaining intact over 100 years and it shows to that minimum viability threshold. They are as stated in the study at 1625 numerically large and geographically extensive. Then they have 100 year risk projections to account for all stressors including climate impacts and even under those and they and they analyzed a range of scenarios from anthropogenic human disturbances to see how those populations would respond in a hundred years. Let me ask you on this Roberts study which is you know it seems to me as I recall it relied upon a 17 year data set from one population and it made some assumptions on constant demographic and environmental conditions and so to the extent that we were looking at this study in terms of how it dealt with this log perch population I mean why isn't it those assumptions didn't really take in consideration other factors that should have been considered? Well the 17 year data set is the best available data set and the petitioners don't cite anything better that either the authors or the service could have used. The 17 year data set told us two critical things. It said number one there was no temporal trend in environmental stochasticity which is just fluctuations in environmental conditions. So 17 years of data shows no temporal trend and so my friends assertion that well you know everything's going to get worse in the future the data doesn't support that. We can look at 1614 it says there's no temporal trend and that's the best data set. The second thing it tells us. So you have this range wide study so how does it describe the baseline in the action area? Well it describes the current condition of the action area and will be affected by the project and look the baseline is not some mysterious thing that all it requires is a description of the condition of the portion of the listed species in action. That's it and what the service had here is the best you'll ever see. You know my opponents right that in some cases. Mr. McArdle can I go back to what started this? Judge Wynn's initial question was whether the the modeling here actually considered the cumulative effects or not and I just would like to know yes or no. Well it projected forward-looking trends based on existing stressors and the best available data about anthropogenic disturbances. So that's what the service had now. How did the service account for cumulative effect? Wait so that is that a yes or a no? Did it I mean I did it consider cumulative effects or not? It sort of sounds like to me you're saying yes because you're saying it considered this 17 years in the in the actual on the ground and then a hundred year projection. So that sounds cumulative to me but I don't hear a yes or a no to Judge Wynn's initial question. Okay I'm gonna say that's not exactly accurate Your Honor. The way it's described in the biop is that it presents the present and future baseline conditions using the best available data and it it projects future trends based on ongoing stressors. What the cumulative effects analysis is looking for is much narrower. It is specific especially when you have these risk projections. Okay so your answer is no it doesn't necessarily consider the cumulative effects in the way that you typically think of it but it's better than considering the cumulative effects. Is that what you're saying? What yeah it is better than what you'll see in any other biop because it has a it's a quantitative assessment looking forward 100 years but what the service was looking for then in its cumulative effects analysis is hey are there any specific future non-federal projects that are likely to occur reasonably certain to occur in the action area that might cast doubt on those risk projections and require additional analysis. And so what the service did it was relied on Mountain Valley search of state permitting databases stormwater permitting databases and looked at the projects that those search that search turned up. Now why was that sufficient? Here's why but it captured any project that disturbs more than one acre of land which is exactly the kind of project that you'd expect to generate sediments that could accumulate with sediments from the project. So that was an appropriate search parameter and there's another critical consideration. Remember that any actual in water work would require likely require at least Clean Water Act authorization from the Corps which would be a federal action that's excluded from the cumulative effects analysis under the ESA and MVP noted that point at 906 note 22 in the record and FERC actually noted that point as well at 1593. So these projects the only things that are happening in this action area? No there are ongoing stressors in action area and they are discussed in the bio they're discussed in the Roberts study they're discussed in the SSA and they are accounted for in the the population specific assessments and risk projections in those two studies which was the entire point of the studies and they are. Go ahead. It looks like the model assumed there were no floods droughts and did not consider the impact of the non-point runoff so other things like channelization and things of that nature so explain that I'm trying to understand why that would not why they would assume those kind of things. I would say that's not quite accurate your honor what they did was they came up with a term for their model. So you're saying it's not accurate that they they did not that they assume no floods and they assume no droughts and etc. You're saying that's not accurate? That's not accurate I guess it'd be better to say they accounted for those types of events because they used a 17-year data set and they say this in the study and actually in the biop at 49 and at 1627 and 1617. That period of time they thought was appropriate to develop a term to capture environmental conditions looking forward because it covered the full range of population variability and it also covered a period during which there were extreme high flow and low flow events so that modeling term was appropriate to account for environmental conditions and include in the modeling and by relying on that in his jeopardy analysis at pages 48 and 148 the service also accounted for climate impacts. Now look could the biop considered climate change with regard to the candy daughter and the log perch? Yes indirectly by relying on the risk projections. Well that was going to be my follow-up question because I don't see the phrase climate change anywhere in the biop so how do we know that it was considered? Well climate change is referenced in the biop with respect to the log perch of JA 49. It's not specifically referenced in the biop with respect to the candy daughter but it is in the services species status assessment which the service relied on throughout the document. So I think your honor this is a classic case where that what you were referring to is that one sentence that's in there? Well that's the one sentence where the service expressed its concern about climate change. What what it's concerned about is not climate change per se but environmental events like storms and droughts. Exactly the type of things that the modeling in the Roberts study was designed to capture. So where in the Roberts study is this climate change mentioned? It doesn't it doesn't that sorry your honor. No I'm just asking I want to be specific I think that I cannot trying to understand that because I said this is a specific thing and I want to be careful because you say something it's not the end of it. I mean we go back and listen to what you're saying and then we go to the record and says is it really in the record like that or does it say that and that's that's probably not helpful to you. I don't want you to get a negative benefit negative negative reaction something that you really could explain and so I'm just asking where in the Roberts study does it mention climate change? Because I could point out the word is not in there. Right that's correct. The words climate change are not in there. They are in the biop. So where does it even mention it? Anything about it? Your scientists in 2016 it's not that they were unaware of climate change it's that climate change per se is not the concern. The concern is the consequences on the ground. The climate related impacts floods and droughts. And so do I read that to say that it wasn't needed. You don't need to talk about climate change. You need to account for environmental events. You don't need to specifically mention climate change but you know this is a classic. Isn't that kind of change? Isn't that a big deal? This I mean not living in a vacuum here. Well I'm just asking is it if I'm reading correctly you're saying well these are knowledgeable people they know stuff and all of that but I mean we got to look at the record. I'm wondering where in the Roberts study there this is being accounted for. If your answer is it doesn't really matter that's not something that's important. I don't know but I want to be clear on your answer on it. My answer is not that it doesn't matter. Ultimately the answer may be that it's not all that important for the species but it certainly matters. It's something that has to be considered. Everybody's aware of it and no one more so than the three scientists who authored this in 2016. But the words climate change is not significant issue. The significant issue are storm events, high flow events and the service itself said that at JA 49. They said that's what we're concerned about with respect to climate change. Increasing storm events and high flow events. So the study includes storm events? Yes it developed the term for its modeling. You're saying the Roberts study included specific reference to storm events? No. I don't know if it uses the word storm. Let's say that it doesn't. I don't want to say something that's not. You did that's why I asked what was it in there. I mean you used it. The biop uses the word storm events. What the period of highest flow and lowest flow on record. So I'd ask you earlier did it explicitly reject flooding and droughts? The style? Did it explicitly address or reject? I thought I read it that now again this is your bailiwick. I'm having to dig into it. There's a lot of study got to be done for me here. But I want to be clear because that's an aspect of it that sort of was a highlight to me. I thought I read that it rejected those things of floods and droughts. And if it didn't then it just didn't. I mean but I know I read it. I don't I don't think that's a correct reading. I think I would look at J1617 where they say we think this was these 17 year data set was appropriate to use for our term our modeling to account for environmental stochasticity. Because quote it encompassed some of the highest and lowest stream of flow events on record. So that's what I thought the first these are the words I read in there. We chose not to consider floods or droughts. They chose not to consider them as catastrophes. As what? As catastrophes. Where is that qualification? It says it right in the study I'm almost certain. I think it's in page. They they included a catastrophe scenario for human caused events. They didn't include a catastrophe scenario for storm relief for environmental stochasticity because the 17 year data set captured the full range of population variability and high flow and low flow events. And there's another critical factor. It indicated that live birch populations are not dramatically affected by floods and droughts. That's why it didn't use environmental stochasticity as a catastrophe. But it didn't. So now aren't you glad I asked that question so I could get that explanation. But if they're not considered as catastrophes then where are they included in the study? Well they say they developed a term to account for environmental stochasticity which is these fluctuating environmental conditions. Whether due to climate change El Nino or any other factor. And so that's what we're relying on. That's what the service relies on when they rely on these risk projections to account for climate change. And look could the service have been more explicit and connected the dots? Of course. Of course they could. That's why this is an issue. I mean as far as I can recall we've been at this for four years and no one's ever raised climate change. It's raised here because they didn't they didn't do explain it as clearly as they could have. But of course there's a basic proposition of administrative law that this court itself, this panel itself applied in the North Carolina Department of Environmental Quality case where an agency's decision will be upheld even if less than an ideal clarity if its path can be reasonably discerned. And also the briefs we cited in our brief, I'm sorry the cases, the Miller v. Layman, the Missouri River, we look to the record as a whole. And so yes the service could have done a better job here. But the critical thing is that you rely on the 2016 study primarily correct for the log perch. That's a key element, not an exclusive element, but a key element of the baseline. That's what I said. Primarily. I'm sorry, Your Honor. I agree. Is that a yes to my question? Yes. And is it also true that the data for that study was collected in 2014? That's when the 17 year data set ended. Okay. So that was seven years ago. Correct. It seems like you cite to a lot of potential problems. But how do you how do you address that in terms of really have a meaningful impact on your assessment of the cumulative effect to point to something alone is not enough. Is it having pointed to it now? How does this? How do you really relate to that in terms of protecting these species? Shouldn't we know that rather than asking you all of these questions about where that is and trying to figure out what one page or paragraph is? Isn't that the gist of what we really need? You point to these site, these things. Where's the analysis to point out how you incorporate them so you could protect our wonderful lands that belong to all of us is Americans. And your your client is has a responsibility to protect. How did what is that accounting for? Can you point that? I know you have time. So you can just tell us where it is, because that's what I've been looking for us. We looked at throughout the record, so I don't want to ask you questions about what seems to be not even there. But tell me where is it? It's just thought pattern aware that you just announced. Sure, Your Honor, if I could take a minute and answer, I think there are two elements to your question. The first is suggestion that maybe the data set was stale, and I just like to point out that the service also relied on the Roberts 2018 study in which he essentially ratified the findings of the population viability assessment, and that cited a J 49. And then they reached out to Roberts in 2019, and they asked him, Hey, are you aware of any increasing changing threats or changes in the population status? He said no. And he said once again, the most comprehensive review of the status of each population was conducted by Roberts. The 2018 one, which ratified the 2016 study. That's a 12 75. And this is a man, a scientist who states around the same page 12 74 to 75 that he's performed multiple field and molecular research projects for 20 years and has recent range wide experience. So the service did do its homework to try to make sure that these risk projections were still current and valid. Now, your second question, I think if I could just take a minute, I'll try to wrap that up. How did the service use this in analysis? They did it exactly what they were supposed to do. They took these baseline assessments in both studies, and they put them in the jeopardy analysis at page 1 48. I think it is in the jeopardy analysis is where the service discusses these risk projections. Because as we've all we all agree here that the effects of this project can't be understood unless you have a sense of what the condition of the species is. And the service here had a really good sense based on peer reviewed studies that they incorporated into the jeopardy analysis. And that's really the best you could. That's the best that you can do. And it's it's more than rational. I see I'm out of time. I'm sorry, Your Honor. But if there's no more questions, I'll turn it over to So, you know, basically, your whole case relies solely on the the quality of the studies that you rely on, because that's basically what you're saying. We looked at the studies and we cited to the studies, and that's the basis, right? Because the analysis, you say, is baked into the study. Correct. The face of the place will find your all of your analysis is in the study alone. The four corners of correct. I don't get that clear. Well, I just want to be focused around because we did analysis of a lot of things. The effects of the action. You know, there's a detailed analysis of the project's effects. So I don't want to say we just relied exclusively on the studies. So for the baseline component of we relied on the risk projections and population assessments in these two studies, and we also reviewed the ongoing stressors in the action area, which are defined for the for the log perch at 48 and 72 through 73 and also at 75 is where the service incorporates the detailed assessment of ongoing stressors from the SSA. So for the baseline component, these studies played a key role like they should have. But that's not to suggest that that's the entirety of our analysis. I hope that responds to your honor's question. Thank you. Mr Sibling. You're muted. Good morning. And they pleased the court towards simply for Mountain Valley pipeline. I suppose someone had to speak while muted. So I'm glad it was me. Um, I'd like to start where Mr McCardle was finishing, which is talking about the jeopardy analysis and how all of these, um, the environmental baseline, uh, including an assessment of the status of the species, the effects of the project and then communal effects all fit in. It's you're trying to assess whether the action is going to reduce appreciably the prospects for species recovery or cause jeopardy. And you start. The starting point is understanding the status of the species as it exists right now in the project's action area. You assume that those conditions are going to persist. You add the effects of the project to that, and then you add cumulative effects on top of that. And that provides the basis for making the scientific determination about whether the project is going to cause jeopardy. Now, turning to environmental baseline, I would know. Let me let me let me see if we can unpackage what you just said. I want to make sure I understand that because you seem to be claiming that the agency action shouldn't be considered together with the baseline and cumulative effects. So, in effect, what that would lead to seems to me is that you could have. We had one of the species. Uh, you're opposing Council said would be gone in 25 years, teetering on the brink of of extinction due to the baseline and cumulative effects. And then the agency would take action that could kick it over the edge. Uh, but because that alone didn't lead to that jeopardy that that's not a something should be considered. Is that where you're going? No, it's not. I'm I'm you're what I'm trying to explain. Your honor is how the project's activities, the project's effects are put in the context of what's occurring right now and then added to what may accumulate in the future. That's the basic the basic formula for the jeopardy analysis. And as Mr McArdle mentioned in this case, the agency had the ability and understanding environmental baseline in the status of species to rely on peer reviewed scientific studies that specifically assess the status of these specific population. Now, I'd note that my friend on the other side has made representations about how the Roberts study, for example, is only cited once. That's not correct. I think my friend is focused only on the section that's entitled environmental baseline without looking at the status of the species section as well. If the court looks at that section, you will see an extensive analysis and synthesis, not simply off the Roberts 2016 study, but the extensive line of work from Dr Roberts and others studying what's going on with these species broken out by specific population group, you know, for Roanoke and in the Pig River. This is perhaps the most robust set of baseline data that the agency can have to understand how the project effects will add along with cumulative effects to potentially in making its jeopardy determination. Now, with respect to cumulative effects, I'd like to turn to the points my opponent made that first of all, it's no critique to say that Mountain Valley provided the information that the agent, the applicant is supposed to provide data and analysis to the agency, and they did that here. And it's useful to remember that the under the regulations of regulatory definition of cumulative effects activities that qualify are in a very narrow category. They must be future activities, so they're not ongoing or past activities. They must be non-federal. That is key here, and I'll come back to that in a minute. And are you just relying, are you relying solely on just these studies? Yeah, and no. And I think the, I think there's two things going on here. And I think Mr. McArdle's, in answering those questions, I think that was resisting that the conflation of two things. First of all, there's a suggestion that ongoing stressors were not accounted for. Now, ongoing stressors are not within the regulatory definition of cumulative effects. You assume in a jeopardy analysis that those are going to persist. And so technically you don't consider those in evaluating what are cumulative effects under the regulation. So it would be incorrect to say we're relying solely on the studies to look at cumulative effects. We're also looking to see whether there are future non-federal projects in the project's action area that would produce effects that would cumulate with the project's effects. Now, the fact that you're focused on non-federal activities is critical here, because as Mr. McArdle noted, anything that's going to produce effects within water or near water is almost certainly going to require some type of Clean Water Act permit that establishes a federal nexus. And those projects will get their own biological opinion and be assessed independently. And you must look at effects that are likely to cumulate with the effects of this project. And those effects are sedimentation effects. And so naturally, you would look at construction stormwater permitting databases to see, is there anything planned, anything in the offing that we need to account for? It was rationally calculated to identify, to answer the question. The agency was more than reasonable in relying on it. I'd like to close in the time that I have remaining by focusing on calling the court's attention to just how seriously the agency took its mandate to exercise independent judgment. At every term in the record. We're going to take it. We can assume you took this seriously. I mean, it's a serious thing. But I want to ask you a question. You listed six construction projects with accumulative effects. Is that all that's going on in those areas, just those six projects? Well, no, certainly you have activities that are ongoing right now, right? And when you're looking at cumulative effects, you're necessarily confined to the future. You're already assuming that. But I guess I want to make sure I understand you answer it because I see where you're going. You got those six construction projects that are going on. And what else? I mean, you say there are other things, but where does it report account for the other things that are going on? It accounts for it as the report notes in the status of the species in an environmental baseline section. The report goes into great depth about all of the stressors that are affecting the species right now. And under the basic formula of the regulations, you assume that those things persist during the at the outside four years of time that the project's effects will be felt in the area. That's the conclusion. And I would note, incidentally, that's one reason why climate change, which there is an extensive discussion on that, is not terribly important in the context of this particular project. Of course, it's important society wide, but the project's effects at the outside are be felt for four years. Climate change effects are much longer term in nature. So it's natural that you would not be as focused on that factor as you might be in some other types of cases where the project's effects would be more long term. I see that I'm well over my time. If there are no further questions, I'll yield the floor to Ms. Benson. Thank you, Mr. Sibley. Ms. Benson, you have some time reserved. Thank you. Ms. Benson, before you start, start with that last proposition of what does climate change do? I don't want to overstate what they said, but it seems like it's being minimized to the point that maybe it doesn't have the level of relevance that you might would attach to it in the real world. What is your position on that? So the Biop has one sentence on the log perch, climate impacts on the log perch. That sentence, that sole sentence does admit that it's an increasing threat that causes impacts like turbidity. And indeed, in 2018, MVP has repeatedly complained that it was the wettest year on record, and that caused a lot of their sedimentation impacts. Well, that's exactly the type of impact that a climate analysis would help take into account. As for the candy darter impacts for climate change, the species, the services species status assessment says there will be several climate impacts on the darter and that it's highly vulnerable to climate change. Those impacts include not just increased water temperature, but also altered flow conditions and increased sedimentation. And that's in the species status assessment. And these are species, both of these species that are incredibly sensitive to increased sediment. So for the Biop to not even mention climate impacts on the darter, let alone consider them in conjunction with the project's impacts, you know, the court can't defer to avoid, you know, I think the theory is, oh, just trust us, we considered it, but there's no evidence of that in the biological opinion or elsewhere in the record. What about the service reference? Right, so it's the status assessment that says that the candy darter are highly vulnerable to climate change. And those include those impacts include increased water temperature, changes in hydrological conditions, and increased sedimentation. That's all in the species status assessment. It's never referenced in the biological opinion at all, and including not in the jeopardy section. And then as for the log perch, just to go back there briefly, as has been established, the viability analysis does not mention climate change. And it's consideration of environmental stochasticity assumes constant environmental conditions. I think the service and the NMVP agree. Don't go by that word too quickly. I've been waiting for that to come up stochasticity. It's the only time I see it. Now, what's the problem with that? I mean, they account for a data differential as to what it actually is and what that model shows up there. So what's the problem with that? The problem is it's based on outdated data. So their assumptions are for constant conditions over 100 years. We know that in reality, that's not the calling climate change an increasing threat. So a study that reflects assumes constant environmental conditions cannot incorporate or reflect an increasing threat like climate change. And again, we've already seen those impacts in the couple of years that this pipeline has been going. In 2018, it was the wettest year on record. Is there a problem with assuming that environmental stochasticity would remain constant? Yes, exactly. That's the problem is, is that it's not remaining constant, that it's increasing because of climate change. And as I said, the Biop acknowledges that it says climate is an increasing threat, which is something I think we all know. Just to go briefly back to the environmental baseline. Yes, the Biop mentions a few ongoing stressors in the status of the species section and the environmental baseline section. The problem is there's no specificity, there's no analysis. We don't know how these impacts are affecting the log perch in the action area, which is the relevant area for this inquiry. And the consultation handbook that service authored says you have to address the in the action area. I think they even underline it in a consultation handbook in the action area. That is what they failed to do here. And they can't possibly add the effects of the action to the baseline when they failed to establish that. Just briefly, in terms of understanding the status of these populations, Dr. Ingermeyer, the log perch expert, who was another author of the viability analysis, along with Dr. Roberts, told the service and comments on this forging can threaten population persistence. So just dismissing these impacts because they may not make the population drop below a minimum viable population threshold is inadequate. And I seem out of time. Thank you. Thank you, Ms. Benson. Thank you, Council. Again, we can't come down and shake your hand as we would like to do, but know that we appreciate you very much and help in this case. And we wish you well and stay safe. Thank you, Council, very much.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker